## DICKINSON *et al.* v. HAHN.

In an action for a part of the broker's commissions for the sale of land, evidence held insufficient to establish plaintiffs' claim that they rendered services in effecting the sale.

HANEY, J., dissenting.

(Opinion filed July 6, 1905.)

Appeal from circuit court, Hanson county; Hon. FRANK B. SMITH, Judge.

Action by Isiah Dickinson and another against A. G. Hahn. From a judgment for plaintiffs, defendant appeals. Reversed.

*Zollman & Kelso* (Philo Hall, of counsel), for appellant.

*E. E. Wagner,* for respondents.

FULLER, J.   On an alleged claim of $667 as their  interest in certain commissions arising from the sale of three  separate and distinct tracts of Hanson county land, plaintiffs  recovered judgment for $343.75, together with costs, and  the  defendant has appealed.   The evidence offered to support the  complaint tends to show that some time during the month of May,  1902, or early in June of that year, respondents and  appellant  entered into a contractual relation, the main  characteristics of which may be stated briefly as follows:   Appellant, who was a resident of the village of Fulton, and engaged in  the  real  estate business, apparently owned certain lands, and had  other tracts listed, which he was authorized to  sell  on  commission. He also owned a printing office, in which the  respondent  Dan W. Dickinson was employed, while his father, Isiah Dickinson, was engaged in the business of farming near the town  of  Fulton.   Negotiations began at the Dickinson farm, where  appellant proposed to give respondents $1 per acre for  assisting in the sale of any lands then upon his list, and one-half  of  all that could be netted in the way of commissions on sales of such lands as they might subsequently list jointly. regardless  as  to which of the parties procured the purchasers and  transacted the business. . If the testimony of Isiah Dickinson is true,  the foregoing proposition was squarely accepted by respond ents, and pursuant to such agreement the parties proceeded to procure a list of lands in the sale of which they were to  share the commissions equally after deducting such  expenses  as might necessarily be incurred in the transaction of the business. .With reference to appellant, and what was immediately said and done, the witness testified in part as follows:   "We start ed that day with the expectation of getting some land  on  our

list. He said he thought that I, being a farmer, could get out and build up a better list than he could. It was after we had that conversation that we started out and drove to Farmer— the same day. The first man we did any business with was Mr. Smith. We took his land on our list that day; and we took Mr. Fred White's land; also Mr. George Smith's. I agreed to engage in business with him on the basis I have stated. Mr. Hahn wanted to know if it was agreeable with me for Dan to do the office work, to take care of the printing office and land office, to take care of any business that would come there. We were to have one-half of the profits on the land we listed together, and one dollar an acre on lands he had already listed that we helped him to sell. He told me at that time what he wanted me to do. He said when he had customers from the East, by bringing them to me on the farm, my word would go further than his, he being known to be in the real estate business. * * * We listed land after that together in Hanson county. I listed quite a good deal of land every piece of land I could get after that. I went to see the owners about the prices and terms, and got his net price—got the right to sell the farm. I put the lists in the office there after that. * * * The arrangement with Mr. Hahn was that lands we listed together and either of us sold we were to divide the commission, and lands that he had already listed we were to receive one dollar an acre. I do not think we were to take land separately. Any land that was listed after that should be sold by the company—any new land that we should list, either of us." The witness further testified that of the land thus listed by the parties to this action two separate and distinct tracts, aggregating 320 acres, were sold during the

season, and that he assisted in bringing about a sale of 320 acres, situated in a contiguous body, which had been previously listed by appellant. What he did with reference to the transaction is stated thus: "This land was sold to Mr. Stoner. I saw Mr. Stoner at the time this land was sold. Mr. Hahn brought him out to my place. He introduced him to me. I don't think Mr. Hahn said anything much, only Mr. Stoner was looking for land, and he told me what land he was showing him—what he wanted to sell him. I had some talk with Mr. Stoner. Q. Tell the jury what talk you had with Mr. Stoner. A. Mr. Stoner wanted to know my opinion of this country; wanted to know how long I had been here, and if I had been farming all the time. And I happened to be fixing fence when they drove in, and Mr. Stoner took the spade and dug in the cornfield. This was some time in June. This was a half section—three hundred and some acres. Mr. Stoner bargained for the land that day. I talked with Mr. Hahn afterwards about the sale of this land to Stoner. Mr. Hahn informed me afterwards he had sold that land. He never said anything about paying me commission. I don't think I asked him for a settlement until last spring. He said he didn't want to settle. I think he stated in Mr. Zollman's office that I wasn't entitled to anything for the sale of this land. * * * Mr. Van Possel owned the land that Mr. Stoner bought. Prior to the selling of this land, Mr. Hahn said he must turn this land; that it was one of the tracts he was anxious to turn and get off the list. He said for me to help him all I could on that piece of land, and I would stand in for a dollar an acre. I do not know whether he had an option on this land or not. This was not very long before Mr. Stoner came

out to my place. Anything he had on his list that I helped him sell I was to have a dollar an acre. Mr. Stoner was out from Illinois with Mr. Sheller." Concerning one of the separate quarter sections first above mentioned, being what is designated in the record as the "Bard Land," it is admitted that respondents assisted to some extent in making the sale, and there is evidence tending to show that in appellant's absence from the state, and pursuant to his direction, Isiah Dickinson met the prospective purchasers on their arrival from Illinois, together with certain other land agents, and took them into the country, where several days were spent in showing land before the bargain was made and contract of sale entered into subject to the approval of appellant, and he afterwards expressed himself as fully satisfied. Though controverted, it may be assumed that respondents were entitled under the contract, as they state it, and in accordance with their testimony, to one-half the net profits to be realized from the sale of this Bard land, but the conclusion is irresistible from the undisputed evidence that the sale was made at a loss, and yet appellant paid them $100 in cash, which they apparently accepted without any objection. Confessedly, the Stoner land, consisting of 317 acres, was on appellant's list prior to making the alleged contract with respondents, and, according to their version thereof, nothing is recoverable in the way of commission on that sale, unless in some manner they assisted in making it, or in the procurement of a purchaser. There is nothing in the testimony offered on behalf of respondents tending to show that either of them ever mentioned the land to Mr. Stoner or to any other person, or performed a single act in furtherance of the sale. Viewed in the most favorable light, Isiah Dickinson did no

19 S. D.—35

more than to receive an introduction to Mr. Stoner, and per-
mit him to use a spade for the purpose of testing the soil on
the farm which the former was occupying as the tenant of an-
other. So the land sold to Mr. Stoner was never mentioned to
any one by either of the respondents, and they knew nothing
about the price or the terms of sale, and the evidence offered
on the part of appellant to the effect that they rendered no as-
sistance with reference to the transaction is overwhelming.
The jury might have found from conflicting testimony pre-
served in the record that such a contract as respondents claim
existed, and that they were entitled to $1 per acre for assisting
in the sale of all lands previously listed by appellant; but the
burden was upon them to establish by a fair preponderance of
the evidence every issue essential to a recovery, and it stands
proved that they had nothing whatever to do with this partic-
ular transaction. While it is alleged that respondents are
entitled under the contract to one half of $300 commission real-
ized from the Huberty land which appellant sold to Mr. Carr,
Isiah Dickinson testified that they mutually agreed to share
the profits equally with Mr. Yost and Mr. Altenhofen, two
other agents, with whom he swore the land had been previous-
ly listed; but he was entirely ignorant as to how much the
owner was to receive, the price for which the land was listed,
or the amount for which it was sold; and on cross examination
states that "it was never put on the list; I think Mr. Hahn
turned it right over." Moreover, respondents introduced a
deed in evidence conveying the land directly from Huberty to
appellant, who testified in his own behalf as follows: "Dick-
insons had nothing whatever to do with the sale of the Huberty
land. This land was never listed with me. I was called up

over the 'phone from Farmer mentioning this land—this Huberty land—as a bargain. This was late in the evening. The next morning by eight o'clock I had the land bought. I paid money down on it and made a contract." Both Yost and Altenhofen testified that they never had the slightest thing to do with either of the Dickinsons with reference to the Huberty land, and knew nothing about it themselves at the time to which such respondent's testimony relates, nor until about the 11th day of July, 1902, when they telephoned appellant to the effect that they had just learned that it was for sale, and he came over early the next morning and made the purchase. Mr. Huberty testified as follows: "I was planting corn when I sold the land known as the Huberty land. I sold it to Mr. Hahn. Isiah Dickinson had nothing whatever to do with this. I have never had any transaction with Isiah Dickinson or Dan Dickinson in reference to this land." Mr. Carr, the grantee named in the deed from appellant, testified thus: "I purchased what is known as the Huberty land in township 103, range 57. I made a great many deals with Mr. Hahn. I am a regular customer of Mr. Hahn's. I don't know of anybody that was interested in it any more than Mr. Hahn. One of the gentlemen there you call Dickinson I don't know at all. The other gentleman I have met. I purchased the land of Mr. Hahn. There was no one else present. I had no dealings with any one else."

The verdict for $343.75 being wholly unsupported by the evidence, and contrary to the instructions of the court to the jury, the judgment appealed from is reversed, and a new trial ordered.

HANEY, J., dissenting.